In re Harold D. MORRIS, d/b/a Morris Piano & Organ Company and f/k/a Hal's Music Mart, Debtor.

THOMAS INTERNATIONAL CORP., Plaintiff,

v.

Harold D. MORRIS, d/b/a Morris Piano & Organ Company and f/k/a Hal's Music Mart, Defendant.

Bankruptcy No. 81 B 04686.
Adv. No. 81 A 1803.

United States Bankruptcy Court,
N.D. Illinois, E.D.

July 12, 1983.

---

David M. Krichiver, Rittenberg, Krichiver, Buffen & McNeal, Chicago, Ill., for Thomas Intern. Corp.

## ORDER

LAWRENCE FISHER, Bankruptcy Judge.

This matter coming on to be heard upon the Complaint of Plaintiff, THOMAS INTERNATIONAL CORPORATION, to determine the dischargeability of debt claimed to be nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code, and deemed to be a Complaint made pursuant to § 523(a)(6) as well, and the Debtor having failed to plead or otherwise defend, and the Court, pursuant to Bankruptcy Rule 755, having determined that in order to enable it to enter a judgment that it was necessary

to determine the amount of damages, and to establish the truth of certain of the averments set forth in the Complaint by evidence, and

The Court having examined the pleadings filed in this matter, and having received and examined the evidence adduced by Plaintiff, and having heard the testimony of witnesses and arguments of counsel, and the Court being fully advised in the premises;

The Court Finds:

1. On or about July 1, 1975, Plaintiff and Sears, Roebuck and Co. ("Sears") entered into a License Agreement pursuant to which Plaintiff was granted the privilege of operating a piano and organ concession in Sears' River Oaks store. The License Agreement, a copy of which was offered and received into evidence as Plaintiff's Exhibit No. 9, provided that Sears would receive a 10% commission on sales made by Plaintiff as licensee. At the close of each business day, Plaintiff was to remit to Sears its gross receipts, including credit detail. Thereafter, on the first and fifteenth days of each month, a settlement would be made between the parties whereby Sears would retain its commissions, as well as any other moneys due under the License Agreement, and remit the balance to Plaintiff.

Plaintiff was authorized by the License Agreement to make sales on Sears' regularly established credit plans after obtaining approval therefor by Sears' Store Manager or Credit Manager. Credit sales were to be treated as cash sales for purposes of the semi-monthly settlement between the parties.

The License Agreement further provided in relevant part as follows:

" . . .

32. . . . (b) LICENSEE covenants that it will protect, defend, hold harmless and indemnify SEARS . . . from and against any and all expenses, claims, actions, liabilities, damages and losses of any kind whatsoever . . . actually or allegedly resulting from or connected with the operation of said Departments . . . or from the omission or commission of any act, lawful or unlawful, by LICENSEE or its agents or employes, whether or not such act is within the scope of the employment of such agents or employes.

33. Subject to the provisions hereof and SEARS prior written approval, LICENSEE shall have the right to sublicense others . . . to operate or conduct said Departments under Sears trademark or tradenames . . ., as SUBLICENSEES of LICENSEE. Said SUBLICENSES shall in no way relieve LICENSEE of any of its obligations hereunder, and LICENSEE shall remain fully and primarily liable therefor.

. . . "

2. On or about May 1, 1979, and pursuant to the provisions quoted above, Plaintiff entered into a Sublicense Agreement with Debtor, whereby Debtor was granted the privilege of operating the piano and organ concession in accordance with the terms of the original License Agreement. The Sublicense Agreement essentially provided that Debtor assume all obligations of Plaintiff under the License Agreement, including the payment of all commissions due by Plaintiff thereunder and the payment of all other costs and expenses required thereby. The Sublicense Agreement further provided in relevant part as follows:

" . . .

SUBLICENSEE shall protect, indemnify and hold harmless THOMAS and SEARS . . . from and against all claims, demands, damages, . . . losses, liabilities, . . . fees, costs, expenses . . . and causes of action of any kind and nature whatsoever directly or indirectly arising . . . out of . . . or in any way connected with [i] SUBLICENSEE's operation . . . of the Department . . ., [ii] the failure of SUBLICENSEE to perform any of its obligations herein provided or assumed hereunder, . . . or [iv] any act or omission of SUBLICENSEE . . . "

A copy of the Sublicense Agreement and an appendix thereto were offered and received into evidence as Plaintiff's Group Exhibit No. 8.

3. While operating as sublicensee under the aforesaid agreement, Debtor from time to time made sales of merchandise on Sears' regularly established lay-away plan. When such sales were made, Sears would retain its 10% commission from the downpayment, if any, received by Debtor and turned in to Sears at the close of the business day. Sears would then remit 90% of the sales price to Debtor as part of the semi-monthly settlement between the parties.

4. On or about August 25, 1980, Frederick C. Goddard purchased from Debtor, on the Sears lay-away plan, an organ and bench which had been consigned to Debtor by Plaintiff. The purchase price was $3,640.00, including $640.00 sales tax. At the time of purchase, Goddard made a $640.00 downpayment by check made payable to Hal Morris, Debtor herein, and Debtor remitted this sum to Sears. Sears retained its 10% commission and thereafter paid Debtor 90% of the purchase price.

Goddard made three additional payments, each by check in the amount of $1,000.00 payable to Hal Morris. Debtor remitted to Sears only one of these three payments. Copies of the four checks were offered and received into evidence as part of Plaintiff's Group Exhibit No. 1.

5. On or about November 5, 1980, Rafael Almazan purchased from Debtor a cable piano and bench for a price of $1,266.70, including $71.70 sales tax. At the time of purchase, Almazan made a cash downpayment in the amount of $200.00, which was remitted by Debtor to Sears at the close of the business day. Sears retained its 10% commission and thereafter paid Debtor 90% of the purchase price.

On December 20, 1980, Almazan made a payment on the lay-away purchase by check in the amount of $200.00 payable to Hal Morris, $20.00 of which was attributable to the purchase of a lamp. Almazan made the final payment on February 6, 1981 by check in the amount of $886.00 payable to Hal Morris. Copies of these checks were offered and received into evidence as part of Plaintiff's Group Exhibit No. 2. Neither the December 20, 1980 payment nor the February 6, 1981 payment was remitted by Debtor to Sears.

6. On or about January 17, 1981, Debtor prepared a lay-away ticket, offered and received into evidence as Plaintiff's Exhibit No. 3, for the sale of a cable piano and bench to Richard Goodwin. Goodwin was in the Sears store on that date and the ticket was prepared in his presence. He cancelled the sale by phone, however, on or about January 20, 1981.

On the layaway ticket, Debtor listed a sales price of $2,150.00 with a trade-in allowance of $230.00. As part of the semi-monthly settlement between the parties, Sears remitted to Debtor 90% of the sales price. Debtor failed to advise Sears that the sale had been cancelled.

7. On or about February 21, 1981, Debtor prepared a Sears "Retail Credit Check" in the amount of $500.00 seeking the return of a downpayment allegedly made by one Dorothy Barton. The credit slip indicated that Barton had made a $500.00 downpayment on the purchase of a piano and had later cancelled the sale. Barton, however, had made no downpayment and had not purchased a piano from Debtor. Debtor had apparently taken a piano on consignment from Barton and disposed of it without remitting to her any part of the proceeds. He then used the credit slip as a means of effecting payment of his obligation to her. Upon receipt of the credit slip prepared by Debtor, Sears issued a check payable to Barton in the amount of $500.00.

8. Pursuant to the indemnification provisions of the License Agreement, Sears demanded reimbursement from Plaintiff for losses sustained in connection with the foregoing transactions. A list of those charges was offered and received into evidence as Plaintiff's Exhibit No. 6. Plaintiff's Regional Credit Manager, Lorraine Nelles, testified that the total of charges incurred by Plaintiff pursuant to the indemnification provisions as aforesaid was $23,117.47. Plaintiff paid Sears over $14,000.00 in settlement of the debt.

According to Plaintiff's Exhibit No. 6, Sears charged Plaintiff the following amounts in connection with the subject transactions: $2,000.00 on account of the Goddard transaction; $1,068.70 on account of the Almazan transaction; and $1,922.00 on account of the Goodwin transaction. Nelles testified that Sears charged Plaintiff $500.00 in connection with the Barton transaction.

■ The Court Concludes and Further Finds:

1. § 523(a) of the Bankruptcy Code provides in relevant part as follows:

"(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; . . .

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . ."

2. In the Goodwin and Barton transactions, each of which involved the receipt of funds on account of fictitious sales, Debtor obtained money from Sears through false pretenses, false representations, or actual fraud within the meaning and purview of § 523(a)(2)(A) quoted above. In the Goddard and Almazan transactions, Debtor willfully and maliciously converted to his own use property belonging to Sears, viz., payments made on account of lay-away purchases which should have been remitted to Sears. Debtor's conversion of these funds constitutes a willful and malicious injury to the property of Sears within the purview of § 523(a)(6).

3. Paragraphs 32(b) and 33 of the License Agreement, together with the provisions of the Sublicense Agreement, consti-

tuted Plaintiff a surety for the payment of any debts incurred by Debtor to Sears in connection with the operation of the piano and organ department. Plaintiff has satisfied Debtor's obligations to Sears incurred in connection with the subject transactions and as surety, Plaintiff is subrogated to Sears' rights concerning its claim against Debtor arising from his fraudulent and dishonest acts.

As subrogee, Plaintiff is entitled to a finding of nondischargeability in the same manner and effect as is its assured, Sears. While there is some authority to the contrary, *see, e.g., National Collection Agency, Inc. v. Trahan,* 624 F.2d 906 (9th Cir.1980); *Leinkauf v. Wellhouse,* 1 Ga.App. 670, 57 S.E. 961 (1907), the weight of authority holds that where a surety pays the nondischargeable obligation of its principal, the surety is subrogated not only to the assured's claim against the principal, but to the nondischargeable quality of the obligation as well. *See In re Waite,* 698 F.2d 1177 (11th Cir.1983) (taxes nondischargeable under § 523(a)(1) of the Bankruptcy Code); *Gilbert v. United States Fidelity & Guaranty Company,* 180 F.Supp. 794 (M.D.Ga.1959), *aff'd,* 274 F.2d 823 (5th Cir.1960) (taxes nondischargeable under former § 17a(1) of the Bankruptcy Act of 1898, as amended); *Western Surety Company v. Rich,* 141 F.Supp. 872 (W.D.Okl.1956) (liability for willful and malicious injury, nondischargeable under former § 17a(2) as it existed prior to the 1970 Amendment, Pub.L. 91–467); *In re Woerner,* 19 B.R. 708 (Bkrtcy.D. Kan.1982) (taxes nondischargeable under § 523(a)(1)); *St. Paul-Mercury Indemnity Co. v. Donaldson,* 225 S.C. 476, 83 S.E.2d 159 (1954) (taxes nondischargeable under former § 17a(1)); *Hartford Accident & Indemnity Co. v. Ankeny,* 199 Or. 310, 261 P.2d 387 (1953) (liability for willful and malicious conversion, nondischargeable as a willful and malicious injury to property under former § 17a(2) as it existed prior to the 1970 Amendment, Pub.L. 91–467); *National Surety Co. v. Wittich,* 185 Minn. 321, 240 N.W. 888 (1932) (debt created by defal-

cation while acting as a public officer, nondischargeable under former § 17a(4)).

4. Where a debt is determined to be nondischargeable, it is this Court's responsibility to determine the amount of damages to which plaintiff is entitled and render judgment. In this case, the measure of damages is the $5,490.70 paid by Plaintiff as surety on account of Debtor's obligations to Sears arising out of the subject transactions. The prayer for punitive damages will be denied.

5. Plaintiff requested a reasonable attorney's fee for his services in this proceeding. As there is no statutory basis for such an award, this request will also be denied.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Complaint of THOMAS INTERNATIONAL CORPORATION to determine the dischargeability of a debt claimed to be nondischargeable pursuant to § 523(a)(2)(A) of the Bankruptcy Code, and deemed to be a Complaint made pursuant to § 523(a)(6) as well, be, and the same is hereby allowed to the extent of $5,490.70; and that the balance of the debt of Debtor, HAROLD D. MORRIS, to Plaintiff, THOMAS INTERNATIONAL CORPORATION, be, and the same is hereby declared to be dischargeable in bankruptcy.

Concurrent herewith, a judgment will be entered in favor of Plaintiff against HAROLD D. MORRIS in the amount of Five Thousand Four Hundred Ninety Dollars and Seventy Cents ($5,490.70).